UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

| | | | |
|---|---|---|---|
| IN RE: | ) | CASE NO. | 07-20151 (JAM) |
| | ) | | |
| VILLAGE MANOR HEALTH CARE, INC., | ) ) | CHAPTER | 7 |
| | ) | | |
| DEBTOR. | ) ) ) | ECF NOS. | 1426, 1529, 1579, 1583, 1607, 1803, 1845, 1858, 1869, 1897 |

## MEMORANDUM AND ORDER ON MOTION FOR SANCTIONS

**I.   Procedural History**

Before the Court is a Motion for Sanctions dated January 14, 2015 (the "Motion for Sanctions", ECF No. 1845), filed on behalf of Colonial Health & Rehab Center of Plainfield, LLC (the "Buyer"). The Buyer seeks an award of further civil contempt damages in connection with its purchase of the Debtor's nursing home facility and an unfair labor practices charge (the "NLRB charge"), filed against it by the New England Health Care Employees Union, District 1199, SEIU (the "Union").[1] The following procedural history is relevant to the relief sought in the Motion for Sanctions.

**A.   The Sale Order, the Motion for Contempt, and the Contempt Order**

On May 29, 2012, an order entered approving the sale of the Debtor's nursing home facility to the Buyer (the "Sale Order", ECF No. 1426). The Union then filed the NLRB charge against the Buyer. On November 9, 2012, the Buyer filed a Motion for Contempt against the Union (the "Motion for Contempt", ECF No. 1529), alleging that the filing of the NLRB charge was a violation of the Sale Order. On November 27, 2012, the Court granted the Motion

---

[1] On June 11, 2015, the Buyer was awarded attorney's fees and costs in the amount of $23,997.00 due to the Union's contempt (ECF No. 1869).

for Contempt and held the Union in civil contempt for filing and maintaining the NLRB charge (the "Contempt Order", ECF No 1579). The Contempt Order imposed coercive sanctions upon the Union as long as it maintained the NLRB charge and also awarded compensatory costs in an amount to be later determined.

### B. The Motion for Stay Pending Appeal, the Stay Order, and the District Court Ruling on the Contempt Order

On November 28, 2012, the Union filed a Motion for Stay Pending Appeal of the Contempt Order (the "Motion for Stay Pending Appeal", ECF No. 1583). On December 7, 2012, the Court granted the Motion for Stay Pending Appeal of the Contempt Order (the "Stay Order", ECF No. 1607). On December 10, 2012, the Union appealed the Contempt Order to the United States District Court for the District of Connecticut. On December 11, 2013, the United States District Court for the District of Connecticut issued an oral ruling affirming the Bankruptcy Court's Contempt Order. On December 31, 2013, the NLRB charge was withdrawn.

### C. The Motion to Award Fees, Costs, and Damages, the Motion for Sanctions, and the Objection to Motion for Sanctions

On January 16, 2014, the Buyer filed a Motion to Clarify the Stay Pending Appeal and Order of Contempt and Determination of Fees, Costs, and Damages (the "Motion to Award Fees, Costs, and Damages", ECF No. 1803). On April 3, 2014, a hearing on the Motion to Award Fees, Costs, and Damages was held. At the hearing, the Court informed the Buyer that any claim for further damages beyond the award of attorney's fees and costs would have to be brought by a separate motion. The Court took under advisement the amount of attorney's fees and costs to be awarded in connection with the Contempt Order.

On January 14, 2015, the Buyer filed the Motion for Sanctions. On February 10, 2015, the Union filed an Objection to the Motion for Sanctions (the "Objection to the Motion for

2

Sanctions", ECF No. 1858). On May 13, 2015, a hearing was held on the Motion for Sanctions and the Objection to the Motion for Sanctions. On June 11, 2015, an Order on Motion to Clarify and for Sanctions, Fees, and Damages was entered which, *inter alia*: (i) awarded the Buyer attorney's fees and costs in the total amount of $23,997.00; and (ii) scheduled an evidentiary hearing for June 29, 2015, on any further damages to be awarded to the Buyer.

### D. The Evidentiary Hearings on Further Damages and the Motion for Extension of Time

At the evidentiary hearing held on June 29, 2015, the Buyer presented to the Court and to the Union a voluminous set of documents in support its claim for further damages. The Buyer asserted that the Court could determine and award further damages following the Court's review of the documents presented at the hearing. Because the Buyer did not present evidence in accordance with the Federal Rules Evidence, the Federal Rule of Civil Procedure, and the Federal Rules of Bankruptcy Procedure, the Court continued the evidentiary hearing to September 17, 2015, and ordered the parties to properly prepare for the submission of evidence at the continued evidentiary hearing. The parties were required to file lists of witnesses and exhibits by July 28, 2015, and any objections to the lists of witnesses and exhibits were to be filed by August 14, 2015. A hearing on any objections to the list of witnesses and exhibits was to be held on August 27, 2015.

On July 28, 2015, both parties timely filed lists of witnesses and exhibits. The Buyer also filed a Motion to Extend the Time to Supplement Exhibit List and Motion for Continuance and Longer Trial Period (the "Motion for Extension of Time"). On August 27, 2015, the Court held a hearing on the Motion for Extension of Time. On September 1, 2015, the Court entered an Order Granting Motion for Extension of Time and Final Scheduling Order (the "Final Scheduling Order", ECF No. 1897). The Final Scheduling Order required the parties to comply

with Federal Rules of Evidence 403 and 611 and District of Connecticut Local Rules of Civil Procedure 7 and 37(a), extended the date for completion of discovery, and scheduled a final evidentiary hearing on the Motion for Sanctions to be held on December 1, 2015.

**II.   Findings of Fact**

On December 1, 2015, the evidentiary hearing on the Motion for Sanctions was held (the "December 1st hearing"). The Buyer and the Union each called witnesses and introduced exhibits into evidence in support of their respective positions. Based on a thorough review of the record in this case and the evidence admitted at the December 1st hearing, the Court's Findings of Fact and Conclusions of Law pursuant to Federal Rule of Bankruptcy Procedure 7052 are as follows:

1.   On February 5, 2007, Village Manor Health Care, Inc. (the "Debtor"), filed a voluntary Chapter 11 petition in the United States Bankruptcy Court for the District of Connecticut.

2.   At the time of filing, the Debtor owned and operated a ninety (90) bed skilled nursing facility (the "Facility"), located in Plainfield, Connecticut. The Debtor employed approximately 130 people.

3.   Some of the Facility's employees were Union members who received benefits under a collective bargaining agreement. (December 1st transcript[2] at p. 55:15-18).

4.   The collective bargaining agreement between the Debtor and the Union employees (the "CBA"), expired on April 9, 2009. The Debtor honored the terms of the CBA after it expired. (December 1st transcript at p. 38:10-11; 297:18).

---

[2] Citations to the transcript of the December 1st evidentiary hearing (ECF No. 1938), are hereinafter referred to as "December 1st transcript at p.___".

4

5. On March 18, 2010, the Office of the United States Trustee filed a Motion to Appoint a Chapter 11 Trustee in the Debtor's case (the "Motion to Appoint Chapter 11 Trustee", ECF No. 874). The Motion to Appoint Chapter 11 Trustee alleged that the Debtor's President, Stanley Rodowicz, Jr., had fraudulently diverted approximately $329,000.00 of the Debtor's funds to the Debtor's landlord, Village Manor Associates, L.P. The Motion to Appoint Chapter 11 Trustee further asserted that some the diverted funds were paid directly to Stanley Rodowicz Jr., and to his mother, Alma Rodowicz.

6. A hearing on the Motion to Appoint Chapter 11 Trustee was held on March 18, 2010 (the "Chapter 11 Trustee hearing"). At the Chapter 11 Trustee hearing, counsel for the Debtor and counsel for the Debtor's landlord admitted that: (i) Stanley Rodowicz Jr. caused the Debtor to make payments to the landlord well in excess of any amounts approved by the Court; (ii) Alma Rodowicz, Stanley Rodowicz's Jr.'s mother, was a principal of the landlord; and (iii) when the Debtor's funds were diverted to the landlord, Stanley Rodowicz Jr. was in control of both the Debtor and the landlord. (Chapter 11 Trustee hearing transcript at p. 4:15-22; 10:6-8; 10:20-21[3]).

7. At the conclusion of the Chapter 11 Trustee hearing, the Motion to Appoint Chapter 11 Trustee was granted and Thomas C. Boscarino, Esq., was appointed the Chapter 11 Trustee of the Debtor's estate (the "Chapter 11 Trustee").

8. On February 24, 2012, the Chapter 11 Trustee move to sell the Facility by filing a Motion for Order Authorizing Stalking Horse Agreement, Authorizing and Approving Bidding Procedures, Auction Date and Sale Hearing (the "Sale Motion", ECF No. 1351).

---

[3] Citations to the transcript of the Chapter 11 Trustee hearing (ECF No. 1941), are hereinafter referred to as "Chapter 11 Trustee hearing transcript at p.___".

5

9. The Sale Motion disclosed that the Buyer was: (i) the proposed stalking horse bidder; and (ii) a company formed and owned by Curtis Rodowicz ("Curtis Rodowicz"), the nephew of Stanley Rodowicz Jr. and the grandson of Alma Rodowicz.

10. The Sale Motion also disclosed that Curtis Rodowicz is a licensed nursing home administrator in the State of Connecticut and that he had not previously been employed by or otherwise associated with the management of the Debtor or the landlord.

11. On February 29, 2012, the Unsecured Creditors' Committee (the "Committee,") filed a Limited Objection to the Sale Motion (the "Limited Objection", ECF No. 1361), noting a concern about Curtis Rodowicz's family connection to Stanley Rodowicz, Jr. and Alma Rodowicz.

12. On March 1, 2012, a hearing was held on the Sale Motion (the "Sale hearing").

13. At the Sale hearing, the Trustee represented that: (i) the sale to the Buyer would be on essentially the same terms the Trustee had agreed to with a prior potential purchaser; (ii) he had negotiated a purchase and sale agreement with the prior potential purchaser which included a Connecticut Department of Social Services Medicaid daily reimbursement rate that the Facility would receive once the sale closed; (iii) the Buyer agreed to accept the terms of the purchase and sale agreement the Trustee negotiated with the prior potential purchaser, including the daily reimbursement rate (Sale hearing transcript at p. 10:3-6; p. 10:16-18; p. 13:16-21; p. 13:22-23 and 14:1-5[4]).

14. The Trustee further represented that despite extensive efforts of more than a year to sell the Facility, the Buyer was the only interested purchaser and conducting an auction was

---

[4] Citations to the transcript of the Sale hearing (ECF No. 1942), are hereinafter referred to as "Sale hearing transcript at p.___".

6

the only available alternative to closing the Facility. (Sale hearing transcript at p. 8:17-19; 15:6, 11-16).

15.     At the conclusion of the Sale hearing, the Court granted the Sale Motion, approved bidding procedures, and scheduled an auction for May 21, 2012. (Sale hearing transcript at p. 21:14-18).

16.     On May 21, 2012, the auction was conducted. The Buyer submitted the only bid at the auction. (December 1st transcript at p. 16:11-19; ECF No. 1365).

17.     On May 29, 2012, the Court entered the Sale Order authorizing the sale of the Facility to the Buyer free and clear of all liens, claims, interests, and encumbrances. (Sale Order; December 1st transcript at p. 53:10-11).

18.     The Sale Order specifically provided that the sale was free and clear of any obligation on the part of the Buyer to honor the terms of the CBA or the existing terms of employment post-closing. (Sale Order, 7; Tr. of Oral Ruling by the United States District Court for the District of Connecticut, ECF No. 1808, 11:4-14; December 1st transcript at p. 239:20-24).

19.     In connection with its purchase of the Facility, the Buyer intended to implement its own business plan which contained new employee benefit terms and conditions. The employee benefits offered in the Buyer's business plan were less favorable than the employee benefits the Union employees received under the CBA. (Buyer Ex. 1; December 1st transcript at p. 53:14-15; 61:14-25; 62:1-13; 137:7-9; 159:16-20).

20.     On November 5, 2012, the Union filed the NLRB charge. The NLRB charge alleged that the Buyer's failure to recognize the Union employees and to abide by the existing terms and conditions of employment was an unfair labor practice.

21.     On November 9, 2012, the Buyer filed the Motion for Contempt.

22.     On November 14, 2012, the Union filed an Objection to the Motion for Contempt.

23.     On November 27, 2012, the Court granted the Motion for Contempt and entered the Contempt Order.

24.     On November 28, 2012, the Union filed the Motion for Stay Pending Appeal of the Contempt Order.

25.     On December 7, 2012, the Court granted the Motion for Stay Pending Appeal and entered the Stay Order. The Stay Order provided, in relevant part, that

> [i]mposing a stay on enforcement of the Contempt Order need not cause substantial harm to [the Buyer]; [the Buyer] is not bound to consummate the sale while the appeal is pending. The Court declines to speculate as to whether [the Buyer] will proceed with the sale notwithstanding the possibility of an adverse outcome on appeal or whether it will choose to delay the sale or simply "walk away." Consideration of whether and to what extent any other interested party may be affected, either positively or negatively, would also be speculative in that any such effect depends more heavily on what [the Buyer] opts to do than on whether a stay is in effect.

(Stay Order at 5; December 1st transcript at p. 234:3-14).

26.     The Buyer was aware of and read the language in the Stay Order which indicated the Buyer was not bound to consummate the sale while the appeal of the Contempt Order was pending. (December 1st transcript at p. 234:15-16).

27.     On December 10, 2012, the Union filed the Notice of Appeal of the Contempt Order. (ECF No. 1614).

28.     While the Stay Order and the appeal of the Contempt Order were pending, the Union offered to meet and negotiate directly with the Buyer regarding the Union employees. The Union also agreed to waive any claims that the Buyer would be deemed to have recognized the Union if meetings and negotiations were held. The Buyer refused to meet with the Union. (December 1st transcript at p. 44:12-20; 45:9-10; 46:7-11).

8

29. After the NLRB charge was filed, the Stay Order was entered, and the Union appealed the Contempt Order, the Buyer told the Trustee that it was going to walk away from the sale because it was unwilling to invest $1,000,000.00 in a building that could potentially be the subject of an injunction under Section 10(j) of the National Labor Relations Act. (December 1st transcript at p. 26:21-25; 27:1-2; 80:17-25; 189:11-16).

30. On December 21, 2012, the Buyer decided to close the sale of the Facility because it obtained a higher Medicaid daily reimbursement rate from the Connecticut Department of Social Services. (December 1st transcript at p. 189:6-16).

31. The higher Medicaid daily reimbursement rate was the reason the Buyer closed the sale because it allowed the Buyer to: (i) offset the costs associated with recognizing the Union; (ii) acquire the Facility; and (iii) save the Facility from closing. (December 1st transcript at p. 189:14-16; 247:7-17, 25; 248:1-7).

32. On December 28, 2012, the sale of the Facility to the Buyer closed. (December 1st transcript at p. 4:14).

33. After the closing of the sale of the Facility, the Buyer recognized the Union employee obligations instead of implementing its proposed business plan. (December 1st transcript at p. 112:23-25; 113:2-16; Buyer Ex. 3; Buyer Ex. 4).

34. The Buyer elected to close the sale and recognize the Union employee obligations because it was the "least impactful" of the Buyer's several options. (December 1st transcript at p. 236:1-2,9; 249:10-23; 252:6-10).

35. No action was taken by the NLRB and no injunction pursuant to Section 10(j) of the National Labor Relations Act ever entered against the Buyer. (December 1st transcript at p. 239:20-24; 298:9-20).

36. On December 11, 2013, the Contempt Order was affirmed by the District Court.

37. On December 31, 2013, the Union's request to withdraw the NLRB charge was granted. (ECF No. 1809-3).

## III. Conclusions of Law

The Buyer argues that as a direct result of the NLRB charge, it was forced to honor the Union's existing employment terms rather than implement its own business plan. (December 1st transcript at p. 237:13-19). According to the Buyer, the amount of further civil contempt damages it should be awarded is the difference between the cost of implementing its own business plan and the cost of honoring the obligations of the Union employees. (December 1st transcript at p. 237:8-9).

The party seeking compensation for civil contempt carries the burden of proof as to those damages. *Cordius Trust v. Kummerfeld Associates, Inc.*, 658 F. Supp. 2d 512, 524 (S.D.N.Y. 2009); *Doctor's Associates, Inc. v. Kwan Chien Hu*, No. CIV. 300CV544PCD, 2002 WL 32173571, at *2 (D. Conn. June 7, 2002); *In re Smith*, No. 12-21033 ASD, 2013 WL 5506280, at *3 (Bankr. D. Conn. Oct. 4, 2013) (placing burden on the movant); *In re Worthing*, 24 B.R. 774, 778 (Bankr. D. Conn. 1982). A court is required to award compensatory damages to such a party only to the extent that they establish actual injury or harm. *Milburn v. Coughlin*, 83 F. App'x 378, 380 (2d Cir. 2003); *E.E.O.C. v. Local 638*, 81 F.3d 1162, 1177 (2d Cir. 1996); *Vuitton et Fils S. A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Utica Coll. v. Gordon*, No. 6:08-CV-88-DNH-GJD, 2009 WL 3418136, at *3 (N.D.N.Y. Oct. 16, 2009) *aff'd*, 389 F. App'x 71 (2d Cir. 2010). A necessary component of establishing actual harm is a showing of causation linking the asserted harm to the civil contempt. *See, e.g., Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 834, 114 S. Ct. 2552, 2561, 129 L. Ed. 2d 642 (1994); *New York*

*State Nat. Org. for Women v. Terry*, 159 F.3d 86, 93 (2d Cir. 1998); *United States v. Dist. Council of New York City & Vicinity of United Bhd. of Carpenters & Joiners of Am.*, 592 F. Supp. 2d 708, 724 (S.D.N.Y. 2009); *Andre Matenciot, Inc. v. David & Dash, Inc.*, 422 F. Supp. 1199, 1211 (S.D.N.Y. 1976) ("plaintiff's recovery will be limited to those provable damages proximately resulting" from the contempt); *Broadview Chem. Corp. v. Loctite Corp.*, 311 F. Supp. 447, 449 (D. Conn. 1970) (compensatory damages for civil contempt "cannot be arrived at by conjecture").

The evidence introduced by the Buyer at the December 1st hearing failed to establish a causal link between the filing of the NLRB charge and the Buyer's alleged damages sustained in not implementing its own business plan. *Bagwell*, 512 U.S. at 834 (Court should "calibrate . . . [compensatory] fines to damages caused by the union's contumacious activities."); *accord, David & Dash, Inc.*, 422 F. Supp. at 1211 (S.D.N.Y. 1976) (recovery limited to "provable damages proximately resulting" from the civil contempt). The testimony of Curtis Rodowicz not only failed to establish the causal link, it instead established that Buyer *chose* to close the purchase of the Facility and further *chose* to honor the existing terms of the Union employees. In so doing, the Buyer made an independent and deliberate business decision based on factors other than the NLRB charge.

Curtis Rodowicz testified that in late December 2012, when the Buyer obtained the *higher* Medicaid daily reimbursement rate from the Connecticut Department of Social Services, the higher reimbursement rate was *the* crucial factor in the Buyer's decision to close the sale of the Facility. The evidence established that the higher reimbursement rate was obtained months after the entry of the Sale Order, the filing of the NLRB charge, and the entry of the Stay Order.

Curtis Rodowicz's testimony directly contradicts the Buyer's repeated assertions that the NLRB charge forced the Buyer to recognize the Union's employees to the Buyer's detriment. The Stay Order explicitly provided the Buyer was not bound to close the sale of the Facility and that it was the Buyer's option to close the sale of the Facility or simply "walk away".[5] Curtis Rodowicz testified that he read and understood the provisions of the Stay Order prior to closing of the sale of the Facility.

The evidence does not support an award of further civil contempt damages to the Buyer. Rather, the evidence establishes that the Buyer made a considered, voluntary, and independent business decision to close the sale of the Facility. The Court is convinced that whatever further consequences flowed from the Buyer's decision to close the sale of the Facility occurred because of the Buyer's own actions and not the Union's contempt.

### IV. Conclusion

Accordingly, it is hereby

**ORDERED** that the Buyer's Motion for Sanctions is GRANTED IN PART consistent with the prior order of this Court dated June 11, 2015, awarding attorney fees and costs in the total amount of $23,997.00 (ECF No. 1869), and the Buyer's request for further civil contempt damages is DENIED.

Dated at New Haven, Connecticut this 25th day of February, 2016.

Julie A. Manning
Chief United States Bankruptcy Judge

---

[5] Stay Order at p. 5.